**Case Nos. 22-5734 / 22-5735 / 22-5736 / 22-5737 / 22-5738**

# In the United States Court of Appeals for the Sixth Circuit

NICHOLAS SANDMANN,

*Plaintiff-Appellant*,

v.

NEW YORK TIMES COMPANY
CBS NEWS, INC.*, et al.*
ABC NEWS, INC.*, et al.*
ROLLING STONE, LLC*, et al.*
GANNETT CO, INC.*, et al.*,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
HONORABLE WILLIAM O. BERTELSMAN, DISTRICT JUDGE, PRESIDING
Case Nos. 2:20-cv-00023, 2:20-cv-00024, 2:20-cv-00025, 2:20-cv-00026, 2:20-cv-00027

**PLAINTIFF-APPELLANT'S
PETITION FOR REHEARING OR REHEARING EN BANC**

TODD V. MCMURTRY, ESQ.
JEFFREY A. STANDEN, ESQ.
J. WILL HUBER, ESQ.
HEMMER WESSELS MCMURTRY PLLC
250 Grandview Drive, Suite 500
Fort Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com
*Attorneys for Plaintiff-Appellant, Nicholas Sandmann*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ................................................................................ 1

PETITION FOR REHEARING ........................................................... 1

   I.   The Panel Opinion Errs in Identifying the Statements That Are the Basis of this Suit ............................................................. 1

   II.   The Panel Opinion Errs in Characterizing Phillips' Statements as Describing Intentions and Perceptions, Instead of Reality .......................... 4

   III.   The Panel Opinion Impermissibly Adds a Requirement to *Milkovich* .. 8

PETITION FOR REHEARING EN BANC ....................................... 10

   I.   The Panel Opinion Fundamentally Misinterprets *Milkovich* .................. 10

   II.   The Panel Opinion Directly Conflicts with *Milkovich* ............................ 12

   III.   The Panel Opinion Constitutes a Precedent-Setting Error of Exceptional Public Importance .......................... 13

CONCLUSION .................................................................................. 15

CERTIFICATE OF COMPLIANCE ................................................ 17

CERTIFICATE OF SERVICE .......................................................... 18

PANEL OPINION ........................................................................... A-1

# TABLE OF AUTHORITIES

**Cases**                                              **Page(s)**

*Cianci v. New Times Pub. Co.*,
  639 F.2d 54 (2d Cir. 1980)....................................................................7

*Compuware Corp. v. Moody's Inv. Serv., Inc.*,
  499 F.3d 520 (6th Cir. 2007)...........................................................8, 10

*Green v. Throckmorton*,
  681 F.3d 853 (6th Cir. 2012)...............................................................5

*Herbert v. Lando*,
  441 U.S. 153 (1979)...............................................................................3

*McCall v. Courier-Journal & Louisville Times Co.*,
  623 S.W.2d 882 (Ky. 1981) ..................................................................4

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990).........................................................................*passim*

*Murray v. Commonwealth*,
  473 S.W.2d 150 (Ky. 1971) ...............................................................12

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)............................................................................13

*Scott v. Harris*,
  550 U.S. 372 (2007).............................................................................5

*Wilmington Tr. Co. v. AEP Generating Co.*,
  859 F.3d 365 (6th Cir. 2017)...............................................................5

**Statutes**                                              **Page(s)**

KRS § 411.045 .........................................................................................4

KRS § 523.020 .......................................................................................12

**Other Authorities**                                **Page(s)**

Restatement (Second) of Torts § 559 ......................................................3

Restatement (Second) of Torts § 577 ......................................................3

Restatement (Second) of Torts § 578 ...................................................3, 4

**INTRODUCTION**

Plaintiff-Appellant Nicholas Sandmann ("Sandmann"), by and through counsel, and pursuant to 28 U.S.C. § 46 and Fed R. App. P. 35 and 40, hereby petitions for rehearing or rehearing en banc of the August 16, 2023, panel decision in *Sandmann v. New York Times Co. et al.*, Case Nos. 22-5734/5735/5736/5737 /5738, RE 40-2 (the "Panel Opinion").[1] Rehearing or Rehearing En Banc is necessary both to: (1) to secure and maintain uniformity of the Court's decisions by correcting errors in the Panel Opinion that conflict with precedent of the Supreme Court of the United States and this Court; and (2) to correct a precedent-setting ruling on a matter of exceptional public importance.

**PETITION FOR REHEARING**

The Panel Opinion errs in several ways.

**I.    The Panel Opinion Errs in Identifying the Statements That Are the Basis of this Suit**

The Panel Opinion mis-states the facts on which this suit is based. This suit is based on the initial publications of the defendants,[2] not on their subsequent articles that qualify and correct their initial reporting. By the time the defendants qualified and corrected their initial statements, the damage had been done: the plaintiff had,

_____

[1]    A copy of the Panel Opinion is attached.

[2]    The five media defendants are collectively referred to herein as the "defendants."

within mere hours and days of the initial coverage, received a full measure of online vilification and hatred, been suspended from his school, and publicly ostracized by his church diocese. It was the defendants' negligence in their initial reporting that is at fault. In writing their initial articles, the defendants failed to view or purposely ignored publicly available and widely shared online videos that showed that Phillips, not Sandmann, had been the aggressor in the matter, striding up to and standing in the close personal space of Sandmann, beating his drum loudly in Sandmann's face, his drumsticks brushing against Sandmann's body. A reasonable investigation of the matter prior to publication would have precluded the false reporting that caused Sandmann's reputational injuries.

As was made clear in the District Court opinion, this suit was based on the initial reporting of the defendants that contained the "blocked retreat" statements. *Sandmann v. New York Times Co.*, No. 2:20-cv-23 (E.D. Ky. 2022) ("*New York Times*") RE 81, Page ID# 2345-2346; RE 27, Page ID# 210-211.[3] It was those initial articles that were published to national audiences, cited widely in print and social media, and referenced in the ostracization that followed. Yet the Panel Opinion repeatedly refers to all of the defendants' reporting, and even some reporting by

---

[3]    For ease of reference, and to minimize duplicate references, this brief will sometimes cite only to the docket entry number(s) and Page ID number(s) of documents filed in the *New York Times* case.

other news outlets, in assessing the legality of the publications, to wit:

- The New York Times "second" article (Panel Opinion at 5);[4]

- CBS subsequent broadcast interview with Phillips;

- Four articles and "several broadcasts" published by ABC; and

- Nine print and online articles published by Gannett between January 19 and January 30, including discussion of appearances by Phillips on the "Today" show.

The defendants' initial negligent republication of the "blocked retreat" narrative was the basis of liability, not the defendants' subsequent reporting. *E.g.*, *New York Times*, RE 1, Page ID# 1 ("The Times' coverage of the January 18 Incident included at least seven (7) articles, only one (1) of which is the subject of this action."). Subsequent articles, even complete retractions, do not exonerate the defendants from responsibility for their initial defamatory statements. *See* RESTATEMENT (SECOND) OF TORTS ("RESTATEMENT") §§ 559, 577, 578 cmt. e. Indeed, subsequent corrections and qualifications provide evidence of the defendants' initial negligence, *see Herbert v. Lando*, 441 U.S. 153, n. 12 (1979) (suggesting fault may be inferred from "prior

---

[4]    Although the Panel Opinion refers to these two versions as "almost identical," the headline is remarkably not identical, as the first is pointedly incendiary while the second is purely descriptive: "Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March" (first version); "Viral Video Shows Boys in 'Make America Great Again' Hats Surrounding Native Elder" (second version).

or subsequent defamations" and "subsequent statements of the defendant"), here exacerbated by the fact that these statements concerned a private figure who was also a minor. In Kentucky, retractions or subsequent qualifiers do not diminish a defendant's liability for defamation. *See* KRS § 411.045 (mitigating circumstances only operate to reduce the amount of damages, not liability); RESTATEMENT § 578 cmt e. (republisher is liable even if he expresses doubt as to the truth of the statement); *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 886 (Ky. 1981) (rejecting neutral reportage privilege).

## II. The Panel Opinion Errs in Characterizing Phillips' Statements as Describing Intentions and Perceptions, Instead of Reality

The factual errors in the Panel Opinion lead directly to a mistake of law. Because the Panel Opinion erroneously expanded the list of publications at issue to include the defendants' various subsequent re-statements and qualifications as part of the case, the Panel Opinion incorrectly concludes that the defamatory statements, considered in this broad "setting-specific" context (Panel Opinion at 14), constituted statements of opinion, not fact. In short, by its unwarranted expansion of the articles and publications under consideration in this matter, beyond any set of facts contemplated by either party or by the District Court, the Panel Opinion introduces a level of subjectivity, of "he said / she said," into the matter, when no such equality of consideration or balance in reporting was present in the initial publications that formed the basis for this suit. None of the statements, "fuller considerations," or

other qualifying comments or retractions that appeared subsequently in the defendants' various outlets is even relevant to this case. The Panel Opinion's inclusion of these factors in its analysis constitutes error.

While it expanded the range of publications it considered, the Panel Opinion failed to consider properly the evidence that, as both parties agree, lies at the heart of this negligence case: the ample video evidence available to the defendants well prior to their decisions to publish. The video evidence shows clearly the falsity of Phillips' accusations.[5] Yet according to the Panel Opinion, such video evidence is of no relevance. "There is no way to determine what Sandmann's intent was from the videos of the encounter …." (Panel Opinion at 15). Likewise, the objective video evidence of the encounter provides no evidence to reveal "Phillips's perception of Sandmann's intent." (Panel Opinion at 16). In short, because of the Panel's contention that Phillips' statements describe "intentions" and "perceptions," the clear video evidence, according to the Panel Opinion, is of no relevance.[6]

In its disregard of the video evidence, the Panel Opinion is in error.

---

[5]     The appellate court is to find competing inferences in favor of the moving party, not the nonmoving party. *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017).

[6]     Where "there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378, 381 (2007)).

Characterizing Phillips' statements as describing "intentions" and "perceptions" is not consistent with the record, nor is it a reasonable interpretation of the record. Nowhere in the relevant statements does Phillips allude to Sandmann's intent, nor does Phillips ever characterize his descriptions as his own perceptions of the event. Instead, Phillips describes the physical encounter without qualification and with unmistakable reference to conduct, not intentions or perceptions.

- "That guy in the hat stood in my way"

- "He slided to the right"[7]

- "He slided to the left"

- "He just blocked my way"

- "He just stood in front of me"

- "He wouldn't allow me to retreat"

Nowhere in these statements, nor in other statements in the relevant publications,

---

[7]     Both at Oral Argument and in the Panel Opinion, reference was made to the parties' descriptions of the statements as "blocking statements." (Panel Opinion at 6, note 2). This useful shorthand was employed from the beginning of the suit. As alleged in the Complaint, the statements complained of and referenced by "blocking statements" included all the statements, including the "sliding left and right" statements. The Panel Opinion states that the plaintiff mentioned this aspect of the statements in the lower court proceedings "only briefly," implying that the District Court was unaware of these statements. This was not the case. *New York Times*, RE 81, Page ID# 2345. The District Court was well aware of all the facts alleged in the Complaint, referencing them frequently. The District Court also viewed all of the video evidence.

does Phillips allude to mental activities, either his own or Sandmann's.[8]

The decision of the Panel Opinion to recharacterize statements that describe physical reality as statements about "intentions" and "perceptions" is at direct odds with defamation law and the Supreme Court's interpretation of it. In theory, every descriptive statement about the real world could be re-characterized as a statement about one's "perception" of the real world;[9] in this view, impliedly adopted in the Panel Opinion, little room, if any, would be left for the category of objectively verifiable statements about reality. Yet it is the state of "objectively verifiable" that

_____

[8]    The sole point at which it may be argued that Phillips referred to Sandmann's intentions or to his own perceptions is in Phillips' interview statement to CBS. In that interview, Phillips stated that "when the others were moving aside and letting me go, [Sandmann] decided that he wasn't going to do that." Two and three sentences later, Phillips describes graphically Sandmann's movements, sliding to the right and to the left and "putting himself in front of me." The Panel Opinion repeatedly refers this "decided" language as if it pertains to each of Sandmann's (supposed) physical movements to the right and to the left. Yet Phillips himself never said that, only stating that Sandmann had made a decision not to move aside, a point Sandmann himself confirmed in his deposition. Sandmann Dep., RE 74-1, Page ID# 2158. The Panel Opinion's borrowing of "decided" from another sentence, wherein it referred to a different matter, and then stating it applies to every contention in the interview, constitutes error.

[9]    Contrary to the Panel Opinion, the notion that Phillips "felt like" his retreat was blocked cannot on its own transform a statement of fact into one of protected opinion. The Supreme Court has held: "the statement, '[i]n my opinion Jones is a liar,' can cause as much damage to the reputation as the statement, 'Jones is a liar.' As Judge Friendly aptly stated: '[it] would be destructive to the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) (citing *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 64 (2d Cir. 1980)).

is the very touchstone of legal analysis in determining whether a statement is one of fact or opinion. "[A] viable defamation claim exists only where a reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts." *Compuware Corp. v. Moody's Inv. Serv., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (statement is actionable where it is "sufficiently factual to be susceptible of being proved true or false").

If Phillips' unqualified descriptions of a visible (and video-taped) physical reality do not constitute statements where a "reasonable factfinder" could apply the ultimate in objective evidence, namely unedited videographic recordings from multiple angles, and determine the truth or falsehood of those statements, then the legal category of "statements of fact" is relegated to an evanescent and indescribable residual concept.[10] Defamation law and the Court's opinion in *Milkovich* contemplate a much more robust category of "statements of fact."

## III. The Panel Opinion Impermissibly Adds a Requirement to *Milkovich*

In *Milkovich*, the issue was whether an accusation of perjury "is sufficiently factual to be susceptible of being proved true or false." The *Milkovich* Court stated

---

[10]    At Oral Argument, counsel for the defendants conceded that the statements at issue constituted statements of fact, capable of being proven true or false under *Milkovich*. *New York Times*, RE 38-39, Oral Argument Audio Recording at 00:22:43 to 00:25:00.

that a determination of whether the plaintiff in that matter had in fact committed perjury "can be made on a core of objective evidence by comparing, *inter alia*, petitioner's testimony before the [] board with his subsequent testimony before the trial court." *Milkovich*, 497 U.S. at 21.

The Panel Opinion cites this language but misinterprets it. The Panel Opinion reads *Milkovich* as holding that only "objective evidence" may be used in determining whether a statement is "susceptible of being proved true or false." Because, in the Panel's view, video evidence does not supply "objective proof" of Sandmann's intentions or Phillips' perceptions, then no "objective proof" of the matter is possible and the statements at issue all constitute opinion. Yet *Milkovich* does not hold that only "objective evidence" can be used to establish that a statement is "susceptible of being proved true or false." Instead, as *Milkovich* makes clear, the words the Panel Opinion quotes from *Milkovich* merely provide an example of one means of proof. *Milkovich* states that, "in this instance" a determination of whether the plaintiff committed perjury "can be made" (and impliedly need not necessarily be made) "on a core of objective evidence," which core would not constitute the entire proof, but only "inter alia," specifically contemplating other evidence that would also be added to establish that the petitioner had in fact lied.

The Panel Opinion dismisses the appeal on the grounds that "there is no 'core of objective evidence' that allows us to discern Sandmann's intentions during the

encounter." (Panel Opinion at 17). *Milkovich* does not require a "core of objective evidence" in order for a defamatory statement to constitute a "statement of fact" instead of constitutionally protected opinion. The Panel Opinion mistakenly elevates the example of proof used in *Milkovich* to a separate and additional constitutional requirement.

## PETITION FOR REHEARING EN BANC

## I.   The Panel Opinion Fundamentally Misinterprets *Milkovich*

The Supreme Court's opinion in *Milkovich* holds that a statement of fact is one that is "sufficiently factual to be susceptible of being proved true or false." This Court has previously ruled that *Milkovich* means what it says. "[A] viable defamation claim exists only where a reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts." *Compuware Corp.*, 499 F.3d at 529 (citing *Milkovich*, 497 U.S. at 20). The judicial inquiry mandated by *Milkovich* and *Compuware* goes to the nature or character of the statement: is the statement itself one that is "sufficiently factual" that a "reasonable factfinder" could conclude that it is "susceptible of being proved true or false," or, in other words, does it "connote[] actual, objectively verifiable facts." In short, it is the defamatory statement that must be an "objectively verifiable fact," not the proof adduced to establish it.

The Panel Opinion misreads this precedent. It concludes that only what it calls

10

"objective evidence" can be used to determine the truth or falsity of a statement.

> But whether Sandmann "blocked" Phillips, did not "allow" him to retreat, or "decided" that he would not move aside and "positioned himself" so that he "stopped" Phillips are all dependent on perspective and are not "susceptible" of being proven true or false under the circumstances. Unlike the testimony in Milkovich, there is no "core of objective evidence" that allows us to discern Sandmann's intentions during the encounter.

(Panel Opinion at 17).

The added requirement of a "core of objective evidence" creates an unprecedented addition to the plaintiff's burden of proof in defamation cases. In essence, the Panel Opinion requires that only "objective evidence," a category unknown to the law of evidence, may be used to establish whether the statement is susceptible to being proved true or false. *Milkovich* did not create this additional requirement. The *Milkovich* Court's opinion is clear that it is merely providing an example, stating that proof "in this instance" can be made on a core of objective evidence, "inter alia," or among other methods of proof.

It is this mistaken reading of *Milkovich* that causes the Panel Opinion to render the entirety of the video evidence in this case as of no relevance. "There is no way to determine what Sandmann's intent was from the videos of the encounter …." (Panel Opinion at 15). The Panel Opinion states that the issue in the case is Sandmann's subjective intentions and Phillips' felt perceptions, then states that the video evidence, which objectively depicts *precisely* what Phillips was describing,

provides none of the (supposedly) constitutionally required "objective evidence" of the perceptions or intentions and therefore is of no relevance to the case.

Even if the Panel Opinion were correct, and Phillips' statements were descriptions of intentions and perceptions (and not physical reality), video evidence would be highly relevant for a factfinder to discern such intentions and perceptions. The mental state of parties is routinely assessed in part by their conduct. The Panel Opinion's elevation of a mere example in the *Milkovich* opinion to a new and additional constitutional requirement is error.

## II.    The Panel Opinion Directly Conflicts with *Milkovich*

The underlying factual issue in the defamation cause of action in *Milkovich* was whether or not the petitioner had committed perjury in testifying under oath before a state educational board. A newspaper account claimed that he had. The Supreme Court held that whether or not the plaintiff had committed perjury was "sufficiently factual to be susceptible of being proved true or false." The Court reasoned that comparing the petitioner's testimony under oath in the two instances would supply a "core of objective evidence" of perjury. But such evidence alone would not suffice. Making a mere contradictory statement does not amount to perjury; proof of knowledge of falsehood and intention to make a false statement are also required. KRS § 523.020; *Murray v. Commonwealth*, 473 S.W.2d 150, 152 (Ky. 1971). Yet in *Milkovich*, the need to show subjective intentionality did not render a

statement about lying into one not "sufficiently factual." It is the statement itself, specifically whether it is "susceptible of being proved true or false" as determined by the "reasonable factfinder," that is the focus of the constitutional inquiry. The term "liar" arguably connotes far greater subjectivity than does "he slid to the left," or "he blocked me." Yet the former is a statement of fact; the latter the Panel Opinion held to be pure opinion.

## III.    The Panel Opinion Constitutes a Precedent-Setting Error of Exceptional Public Importance

The Commonwealth of Kentucky has a paramount interest in protecting the reputation of its citizens against unwarranted injury. The decisions of the Supreme Court of the United States have always been respectful of that state interest, while at the same time creating sufficient room for the free expression of ideas. The aim of the Court's precedent, starting with *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), has always been characterized by balance and accommodation, creating heightened proof requirements for certain "public" plaintiffs while simultaneously allowing wide room for state-law liability in the case of private plaintiffs, like Nicholas Sandmann.

One aspect of the Court's safeguarding of First Amendment rights lies in the "opinion" doctrine. The Court provided its most detailed definition of constitutionally protected opinion in the *Milkovich* decision. That decision instructed lower federal courts, and state courts applying federal constitutional law, to focus on

13

the substance of the statement, identifying those that a "reasonable factfinder" "could" find "sufficiently factual to be susceptible of being proved true or false." The *Milkovich* test militates in favor of statements that are close to the line to be characterized as statements of fact. A court need not necessarily agree with the "reasonable factfinder": the test is whether a reasonable decision-maker "could" find the statement factual. In addition, the statement need not be entirely "factual," but only "sufficiently factual" for a jury to find it true or false.

The Panel Opinion assessed the statements at issue in a way entirely inconsistent with the approach mandated in *Milkovich*. It did not even discuss whether or not a "reasonable" person could characterize statements describing a person moving left and right or blocking another as "fact" or "opinion;" it did not ask whether the statements, if close to the line, were "sufficiently factual" to be actionable; it somehow concluded that real-time video recordings of the event were of no use in supplying the "core of objective evidence" the Panel Opinion decided is requisite to a successful defamation claim.

If allowed to stand, the Panel Opinion will immediately become a landmark in First Amendment law. In effect, the Panel Opinion re-characterizes statements that describe physical, visible, and video-recorded reality as a series of statements about unknowable intentions and subjective perceptions. If it stands, this reading of the law renders defamation a lost tort. Every statement about reality could be, in the

manner of the Panel Opinion, restated as a statement about "my perception" of reality; similarly, every statement about the physical conduct of another could be re-characterized as a statement about "another's intention" in doing such conduct.

This is not the law, and it cannot be the law. Radical Idealism, which holds that there is no objective reality, and that we can only know our subjective perceptions of reality, has no place in law. Defamation law presumes an objective, knowable reality, where "statements of fact" are a real thing and are actionable. The Supreme Court in *Milkovich* shared the same perspective. The Panel Opinion needs to be reversed on this important point.

## CONCLUSION

For the reasons stated herein, Sandmann respectfully petitions the Court for rehearing or rehearing en banc.

15

Respectfully submitted,

*/s/ Todd V. McMurtry*
TODD V. MCMURTRY
JEFFREY A. STANDEN
J. WILL HUBER
HEMMER WESSELS MCMURTRY, PLLC
250 Grandview Drive, Suite 500
Fort Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com

*Attorneys for Plaintiff-Appellant,*
*Nicholas Sandmann*

16

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

35(b)(2)(A) and 40(b)(1) because it contains 3,652 words, as determined by the

word-count function of Microsoft Word, excluding the parts of the brief exempted

by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word in 14-point

Times New Roman font.

Dated:  August 30, 2023              /s/ Todd V. McMurtry
                                     Todd V. McMurtry

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was electronically filed and served to counsel for Defendants-Appellees by notice through the Court's CM/ECF system this 30th day of August, 2023.

/s/ Todd V. McMurtry
Todd V. McMurtry

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

NICHOLAS SANDMANN,

                 *Plaintiff-Appellant,*

   *v.*

NEW YORK TIMES COMPANY (22-5734); CBS NEWS, INCORPORATED, VIACOMCBS, INCORPORATED, and CBS INTERACTIVE, INCORPORATED (22-5735); ABC NEWS, INC., ABC NEWS INTERACTIVE, INCORPORATED, and WALT DISNEY COMPANY (22-5736); ROLLING STONE, LLC and PENSKE MEDIA CORPORATION (22-5737); GANNETT COMPANY, INC. and GANNETT SATELLITE INFORMATION NETWORK, LLC (22-5738),

                 *Defendants-Appellees.*

       Nos. 22-5734/5735/5736/5737/5738

———————

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:20-cv-00023—William O. Bertelsman, District Judge.

Argued: April 26, 2023

Decided and Filed: August 16, 2023

Before: GRIFFIN, STRANCH, and DAVIS, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Todd V. McMurtry, HEMMER DEFRANK WESSELS, Ft. Mitchell, Kentucky, for Appellant. Nathan Siegel, DAVIS WRIGHT TREMAINE LLP, Washington, D.C., for Appellees. **ON BRIEF:** Todd V. McMurtry, Jeffrey A. Standen, J. Will Huber, HEMMER DEFRANK WESSELS, Ft. Mitchell, Kentucky, for Appellant. Nathan Siegel, Meenakshi Krishnan, DAVIS WRIGHT TREMAINE LLP, Washington, D.C., Robert B. Craig, TAFT STETTINIUS & HOLLISTER LLP, Covington, Kentucky, Dana R. Green, THE NEW YORK TIMES COMPANY, New York, New York, Darren W. Ford, GRAYDON HEAD & RITCHEY LLP, Ft. Mitchell, Kentucky, John C. Greiner, GRAYDON HEAD & RITCHEY LLP,

Cincinnati, Ohio, Natalie J. Spears, Gregory R. Naron, DENTONS US LLP, Chicago, Illinois, Jessica Laurin Meek, DENTONS BINGHAM GREENEBAUM LLP, Indianapolis, Indiana, Kevin T. Shook, FROST BROWN TODD LLC, Columbus, Ohio, Ryan W. Goellner, FROST BROWN TODD LLC, Cincinnati, Ohio, Jason P. Renzelmann, FROST BROWN TODD LLC, Louisville, Kentucky, Michael P. Abate, William R. Adams, KAPLAN JOHNSON ABATE & BIRD LLP, Louisville, Kentucky, Michael J. Grygiel, Cynthia E. Neidl, Candra M. Connelly, GREENBERG TRAURIG, LLP, Albany, New York, for Appellees.

STRANCH, J., delivered the opinion of the court in which DAVIS, J., joined. GRIFFIN, J. (pp. 20–38), delivered a separate dissenting opinion.

---

## OPINION

---

JANE B. STRANCH, Circuit Judge.    On January 18, 2019, then-sixteen-year-old Nicholas Sandmann and his classmates had an interaction with a Native American man named Nathan Phillips by the Lincoln Memorial in Washington, D.C.  Video of the incident went viral, and national news organizations, including the five Defendants (Appellees, or News Organizations) published stories about the day's events and the ensuing public reaction. Sandmann sued, alleging that the Appellees' reporting, which included statements from Phillips about the encounter, was defamatory.  The district court granted the News Organizations' joint motion for summary judgment, finding that the challenged statements were opinion, not fact, and therefore nonactionable.  Sandmann appealed.  For the following reasons, we **AFFIRM**.

### I. BACKGROUND

#### A.  Factual Background

##### 1.  The January 18, 2019 Encounter

On January 18, 2019, Sandmann attended the March for Life, a political demonstration in Washington, D.C., with over one hundred of his classmates from Covington Catholic High School, an all-boys school located in Kentucky.  The group attended the demonstration, bought "Make America Great Again" hats at the White House gift shop, then, at around 5:00 p.m., met on the Lincoln Steps, which lead from the Reflecting Pool to the Lincoln Memorial Plaza and the

Memorial itself.  The Lincoln Steps rise from the west end of the Reflecting Pool and are a direct exit to the Memorial from that side of the Pool.[1]

Other members of the public were in the area as well, including attendees of the Indigenous Peoples March, an unrelated political demonstration that took place in Washington, D.C. the same day.  There were also five or six members of the Black Hebrew Israelites proselytizing near the Lincoln Memorial.  They insulted various onlookers and passersby, including the Covington students, who received permission from a chaperone to shout school cheers and chants in response to the invective directed at them.  One Covington student walked down the steps to the front of the group, took off his shirt, and led the students in loud chants reminiscent of a haka, a ceremonial Māori dance.  After he rejoined the group, the students continued chanting briefly and talking amongst themselves.

Nathan Phillips had participated in the Indigenous Peoples March and was in the area by the Reflecting Pool waiting for friends.  He saw the interaction between the Covington students and Black Hebrew Israelites and was concerned that it would escalate.  Phillips wanted to try and calm the situation through song, so he borrowed a drum from a musician standing nearby and began to sing a traditional Native song that expresses unity.  He initially sang off to the side of the Lincoln Steps, some distance away from the two groups, then decided to walk up and stand in front of the students to put himself between them and the Black Hebrew Israelites.  He approached the Covington group, drumming and singing.  Over the next minute or so, students and onlookers gathered around Phillips, and the Covington students responded to his singing by jumping, chanting, whooping, and in at least one student's case, performing a "tomahawk chop" (a movement of the forearm that mimics a tomahawk axe chopping).

As the space around Phillips filled in, he became concerned for his own safety and that of others with him.  He tried to exit the situation by walking up the steps towards the Lincoln Memorial, and as he began moving forward, students moved out of his way—until he reached Sandmann, who did not move.  The two stood face to face as Phillips played his drum and sang.

---

[1]*See* Nat'l Park Serv., *Features of the Lincoln Memorial*, https://www.nps.gov/linc/learn/historyculture/memorial-features.htm (last visited June 23, 2023); Nat'l Park Serv., *Lincoln Memorial - Maps*, https://www.nps.gov/linc/planyourvisit/maps htm (last visited June 23, 2023).

Other Covington students behind Sandmann moved aside, clearing the steps behind Sandmann that led to the Memorial for about a minute.  Then, one of the students behind Sandmann appeared to wave or signal with his hand, and students who had moved aside filled back in.  For the next several minutes, Phillips drummed and sang; Sandmann continued to stand there, smiling and wearing a "Make America Great Again" hat.  Neither changed his position during the encounter.  When asked "What made you stand in front of the Indian guy?" Sandmann responded that "the whole thing with the black people calling us things and the guy moving through the crowd trying to intimidate us" made him "want to stand up for the school."  R. 74-1, Sandmann Dep. Tr., PageID 2156-57.  He explained: "I figured [it was] time for someone to plant their foot and stand there where I had been and just face up.  And to me, that was standing up for the school, because I wasn't going to move."  *Id.*, PageID 2158.

A chaperone then arrived and told the students to leave, and Sandman walked away.  Phillips concluded his song by raising the drum, turning in a circle, and walking back toward the Reflecting Pool.

## 2. Media Coverage

Videos of the confrontation between a white male teenager in a "Make America Great Again" hat and an elderly Native American man went viral on social media.  National media, including the five News Organizations, covered the incident at length over the following days, with most outlets quoting a statement Phillips made to the Washington Post:

> It was getting ugly, and I was thinking: I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial.  I started going that way, and that guy in the hat stood in my way and we were at an impasse.  He just blocked my way and wouldn't allow me to retreat.

This statement and others like it asserting that Sandmann blocked Phillips are referred to as "blocking statements."  We begin by describing the News Organizations' coverage, which recounted the events of January 18, 2019, and articulated their contested nature.  The online articles at issue embedded, linked to, or referenced some version of the videos, and the print articles referenced the videos as well.  The dissent characterizes the News Organizations' articles

as "embracing" Phillips's version of events.   The articles do not: rather, they describe a contentious encounter, the meaning of which was hotly disputed by participants and witnesses.

The New York Times (the Times) published an article both online and in print on January 19.  The Times issued two almost identical versions of the article; the first was headlined "Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March," and the second "Viral Video Shows Boys in 'Make America Great Again' Hats Surrounding Native Elder.'"  The only other difference between the articles was a disclaimer at the beginning of the second version, which read: "Interviews and additional video footage have offered a fuller picture of what happened in this encounter, including the context that the Native American man approached the students amid broader tensions outside the Lincoln Memorial."  Both versions of the online article embedded a video of the incident immediately below the headline.  The article, which did not mention Sandmann by name, described the January 18 events as seen in viral video footage and situated them within a broader political and historical context.  It included a statement from the Diocese of Covington and Covington Catholic High School condemning the students' behavior and apologizing to Phillips, as well as comments from organizers of the Indigenous Peoples March and other political and public figures.  The blocking statements that Phillips had made to the Washington Post were included in a part of the article that explained who he was and described the Indigenous Peoples March in the words of its organizers and a statement from the Indigenous Peoples Movement.

CBS News Inc. (CBS) published an eight-minute-long broadcast including an interview with Phillips, as well as an associated online article embedding the video segment, both on January 20.  During the broadcast, a reporter asked Phillips to recount his experience.  CBS published the following statement by Phillips, which he made in that interview:

> [Sandmann] just stood in front of me, and when the others were moving aside and letting me go, he decided that he wasn't gonna do that.  You know, I tried to, when I was coming up the steps, I seen him start putting himself in front of me, so I slided [sic] to the right, and he slided [sic] to the right.  I slided [sic] to the left and he slided [sic] to the left – so by the time I got up to him, we were right in

front of him.  He just positioned himself to make sure that he aligned himself with me so that he stopped my exit.[2]

In the video segment, the reporter explained that a recently viral video had shown "what appears to be a standoff" between a group of high school students and a Native American man at the National Mall, but that "more information" was now available to "provide[] better context and depth to what actually happened."  The reporter outlined the public discussion around the video and the judgments that people had made about the students' and Phillips's intentions.  Explaining that a lengthier video had given more context, the reporter noted that "the context it provides suggests that the story is not as originally reported," observing that, for example, the video showed Phillips "insert[ing] himself into the situation."  Then, the reporter explained that CBS "wanted to talk to the students, the parents, but also Mr. Phillips."  The reporter then introduced the interview where Phillips provided his version of events and made the sliding statements.  The broadcast displayed clips of the interaction throughout the interview with Phillips.  At the conclusion of the video, the reporter reiterated that, "again, it's important to add the original story was incomplete.  Now we hope you have more context . . . the video as we've seen shows Mr. Phillips walking into the group, inserting himself, trying to diffuse the situation between the students and the Black Hebrew Israelites."  The online article associated with the video cited both Phillips's and Sandmann's explanations of the event, and it quoted from a statement that Sandmann issued before including the statement Phillips had made in the CBS interview.

ABC News Inc. (ABC) published four articles that were initially the subject of this action, as well as several broadcasts about the incident that were embedded in those articles.  The first online article, titled "Viral video of Catholic school teens in 'MAGA' caps taunting Native Americans draws widespread condemnation; prompts a school investigation," was published on January 20.  The article summarized the incident and quoted the blocking statements Phillips had

---

[2]On appeal, Sandmann refers to this as the "sliding" statement and emphasizes its specific language.  He did not address it independently before the district court in opposing summary judgment, even in his supplemental opposition to CBS's supplemental memorandum, and he mentioned the statement only briefly in his motion for partial summary judgment.  CBS did not address this statement with any specificity in its motion for summary judgment either.  In general, however, the parties applied the same analysis to this statement as they did to the blocking statements, and the district court addressed the CBS statement as part of its broader opinion-versus-fact discussion.  We do the same.

made to the Washington Post.  Immediately after Phillips's statement, the article quoted a statement from an anonymous Covington student providing a different description of the situation:  "[A]n Indigenous American man with a few other men approached the center of the boys and in particular one boy (who goes to my school but I do not know him).  He was beating his drum and chanting something that I couldn't understand.  The boy from my school didn't say anything or move—he just stood there."  The article then quoted a college student present during the encounter who said that the group of Indigenous Peoples March attendees had been peaceful.  The article then included a statement from Sandmann, who said, "I realized everyone had cameras and that perhaps a group of adults was trying to provoke a group of teenagers into a larger conflict.  I was not intentionally making faces at the protestor.  I did smile at one point because I wanted him to know that I was not going to become angry, intimidated or be provoked into a larger confrontation."  And, like, the Times article, the first ABC article reported on comments made by other public figures.

The second ABC article, also published on January 20, was substantially similar to the first and again contained the blocking statements.  This article primarily reported Sandmann's and Phillips's perspectives and statements on the encounter, along with the joint statement from the Diocese of Covington and Covington Catholic High School.  It began with a section of Sandmann's statement, then quoted Phillips's blocking statements and other statements he had made to the press, then returned to Sandmann's statement, noting that he "disputed" Phillips's claims.  The third and fourth ABC articles, both published on January 21, discussed new additional videos that offered "a fuller picture" of what precipitated the encounter.  Both articles contained a characterization of Phillips's blocking statements:  "Some students backed off, but one student wouldn't let him move, he added."  These articles similarly focused on Sandmann's and Phillips's perspectives, with the third article characterizing them as "dueling accounts" and the fourth explaining that Sandmann had "shared his side of the story" in his statement.  Both articles also included their own, independent descriptions of the videotaped events.

<u>Rolling Stone</u> published an article on January 22, 2019, titled "Trump Comes to the Rescue of the MAGA Teens."  The article explained that "in a widely circulated clip, Phillips was taunted by the teens" but that "Sandmann released a statement alleging otherwise," linking

to and quoting part of that statement in the article. The article focused on President Trump's reaction to the incident and the broader controversy that had come to surround it. It quoted Sandmann's statement multiple times and noted that "[a]dditional videos confirm Sandmann's claim" that the Covington students were being harassed by the Black Hebrew Israelites. The article then discussed Phillips's perspective, noting that he "said he felt threatened" and quoting the blocking statements. The last sentence noted that Sandmann would "continue to tell his side of the story when he sits down with Savannah Guthrie of the Today Show[.]"

Finally, <u>Gannett Co.</u> (the Cincinnati Enquirer, Detroit Free Press, Louisville Courier-Journal, the Tennessean, and USA TODAY, or collectively, Gannett) published nine print and online articles about the encounter between January 19 and January 30. The Gannett articles all included the blocking statements or statements of a similar nature, including descriptions of Phillips "trying" to walk away but being "blocked," and of Sandmann "[standing] in his way."

Many of the Gannett articles noted that accounts of the encounter varied. For instance, an online Cincinnati Enquirer article published on January 19 and updated on January 20 quoted Sandmann's statement and explanation that he "believed that by remaining motionless and calm, [he] was helping to diffuse [sic] the situation," then reported that a spokesman for the Indigenous Peoples March said that Phillips had approached the students "in an attempt to defuse the situation." The article quoted the blocking statements, followed by a section of Sandmann's statement that said he "never felt like [he] was blocking the Native American protestor," and that it "was clear to [him] that [Phillips] had singled [him] out for a confrontation." Similarly, the first two paragraphs of a Cincinnati Enquirer article published online on January 20 and in print on January 24 noted that there was "intense debate about how, exactly, the encounter played out," and that "the question of each party's intent has been hotly contested." The article quoted Sandmann's statement multiple times in its description of the events as shown on video, cited Phillips's explanation that he was "trying to defuse the situation," and quoted the blocking statements. Another Cincinnati Enquirer article published online on January 24 and in print on January 25 discussed Phillips's appearance on the "Today" show, which Sandmann had also appeared on, and described Phillips's disagreement with Sandmann's statement. The Detroit Free Press article on that same "Today" show appearance similarly noted that "[w]hile

Sandmann said he wished the students had walked away, Phillips explained he tried to walk away and was blocked."[3]

### B. Procedural History

Sandmann initially sued the Washington Post in February of 2019, then CNN and NBC shortly thereafter, claiming defamation under Kentucky law based on those outlets' publication of allegedly false statements about him. *See Sandmann v. WP Company LLC* (*Washington Post*), No. 2:19-cv-19 (E.D. Ky. 2019); *Sandmann v. CNN*, No. 2:19-cv-31 (E.D. Ky. 2019); *Sandmann v. NBC*, No. 2:19-cv-56 (E.D. Ky. 2019).[4]  The district court granted the Washington Post's motion to dismiss, concluding that some of the challenged statements were not "about" Sandmann as contemplated by defamation law. *See Sandmann v. WP Co. LLC*, 401 F. Supp. 3d 781, 791, 797 (E.D. Ky. 2019).  Others—including the blocking statements—were statements of opinion and therefore non-actionable. *Id.* at 791-93.  The district court emphasized that "[f]ew principles of law are as well-established as the rule that statements of opinion are not actionable in libel actions." *Id.* at 791.  And even if the statements were "about" Sandmann or statements of fact, the court determined, they did not have a defamatory meaning. *See id.* at 793-97.

Sandmann moved for reconsideration of that ruling and for leave to file an amended complaint.  He argued that the district court had prematurely resolved the issue of whether statements were opinion or fact and that the factual record needed further development. *See Washington Post* R. 49-1, R. 60.  The district court granted Sandmann's motion as to three statements "to the extent that [they] state that plaintiff 'blocked' Nathan Phillips and 'would not allow him to retreat.'" *Washington Post* R. 64, PageID 861.  Finding that the three statements "pass[ed] the requirement of 'plausibility,'" after discovery as to those statements and their

---

[3]In providing its summary of the at-issue news coverage, the dissent emphasizes that many of the articles mentioned a statement by Phillips that he heard the students chanting "build that wall," a phrase referring to President Trump's plan to build a wall between the United States and Mexico.  The phrase cannot be heard on audio of the incident, and, as some of the News Organizations reported, Sandmann said that he did not hear any students chant it.  Whether Phillips's statement about the chanting is true or not, it is not at issue.  Sandmann's lawsuit is about the blocking statements and the statement Phillips made in his CBS interview.

[4]Unless otherwise specified, all lower-court citations are to *Sandmann v. The New York Times Company*, 2:20-cv-23 (E.D. Ky. 2020).  Citations beginning with "CBS" refer to case number 2:20-cv-24, which was also filed in the Eastern District of Kentucky in 2020.

context, the court would "consider them anew" at summary judgment. *Id.* The court entered companion rulings in the CNN and NBC cases. *CNN* R. 43; *NBC* R. 43. The Washington Post, CNN, and NBC cases all eventually settled without a final determination by the district court on the merits. *Washington Post* R. 81; *CNN* R. 69; *NBC* R. 83.

In March of 2020, Sandmann filed the five at-issue lawsuits against the Appellees, again alleging defamation under Kentucky law. The district court denied the News Organizations' motions to dismiss, holding that its rulings in *Washington Post* applied equally to Sandmann's new lawsuits. *E.g.*, R. 27. The parties agreed to narrow and bifurcate discovery and summary judgment practice, with the first phase of the case to focus on "the facts pertaining to the encounter" between Sandmann and Phillips, specifically "whether Nathan Phillips' statements that Plaintiff 'blocked' him or 'prevented him from retreating' . . . are true or substantially true, or otherwise not actionable based on the undisputed facts developed during initial discovery and the issues defined in the Court's prior decisions." R. 38, PageID 303-04. After the first phase of discovery, Sandmann moved for partial summary judgment on the issue of falsity, and the Appellees jointly cross-moved for summary judgment.

In 2022, the district court granted the News Organizations' motion. "[A]pply[ing] the same analysis" to all the statements at issue, the court concluded that the challenged statements were objectively unverifiable and therefore unactionable opinion. The court explained that Phillips's statements relied on assumptions about both his and Sandmann's state of mind, and that a reasonable reader would understand that Phillips was "conveying his view of the situation." The court did not reach Appellees' alternative argument that the challenged statements were substantially true, and mooted Sandmann's cross-motion for partial summary judgment. Sandmann timely appealed in each case, and all five appeals were consolidated.

## II. ANALYSIS

On appeal, Sandmann raises two arguments: (1) the district court erred in not applying the law of the case doctrine because, before ruling on the parties' summary judgment motions, it had already determined that the statements were fact, not opinion, and (2) the district court incorrectly determined that the challenged statements were opinion rather than fact.

Appellees urge affirmance on the basis of the statements' opinion status or on any of three additional, alternative grounds.

## A.  Law of the Case

Before we reach the heart of Sandmann's appeal, a brief discussion of the law of the case doctrine is in order.  As the name of the doctrine suggests, "findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation." *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994).  So that litigants are treated consistently, where an issue is "actually decided," "the same issue presented a second time in the same case in the same court should lead to the same result."  *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) (emphasis omitted) (quoting *Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012)).  We review district courts' application of this doctrine for abuse of discretion.  *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002).

Sandmann claims that, because the district court reconsidered its opinion dismissing the blocking statements as opinion, it "reversed itself" and determined that those statements provided a basis for liability (i.e., were fact).  He relies on the companion orders in *Washington Post*, *CNN*, and *NBC*, which concluded that the blocking statements sufficiently "pass[ed] the requirement of 'plausibility'" and thus survived the motions to dismiss of the News Organizations.  He also cites the court's discovery order in the five cases before us, which instructed the parties to focus on "whether Nathan Phillips' statements that Plaintiff 'blocked' him or 'prevented him from retreating' . . . are true or substantially true, or otherwise not actionable based on the undisputed facts developed during initial discovery and the issues defined in the Court's prior decisions."  Without an implied ruling that the statements were factual, Sandmann argues, the court's directive to determine their truth or falsity would be "incomprehensible."

The *Washington Post* order did not establish any law of the case as to the statements' opinion or factual nature.  In that order, the court deemed the statements plausible enough to overcome a motion to dismiss, but it also explained that it would "consider [the issues] anew on

summary judgment" and in fact never ultimately issued an order on the merits before *Washington Post*, *CNN*, and *NBC* settled.

The discovery order in the five cases at hand is similarly inconclusive. In addition to contemplating discovery specifically related to the truth of the statements, it also instructed the parties to conduct discovery about whether the statements are "otherwise not actionable." Given that opinions may be nonactionable under Kentucky defamation law, the district court's directive therefore left open the question of whether the statements were opinion or fact. Moreover, the order's language was identical to language in the parties' jointly submitted report about the scope of contemplated discovery. We find no merit to Sandmann's suggestion that all five defendants silently agreed to limit discovery in a way that implicitly conceded an element essential to the case. The law of the case doctrine does not apply, and the district court did not abuse its discretion in resolving the opinion issue at summary judgment.

### B. Summary Judgment

We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party. *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, 33 F.4th 872, 878 (6th Cir. 2022). Summary judgment is appropriate when the moving party shows that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(a). "[W]here, as here, there is 'a videotape capturing the events in question,' the court must 'view[ ] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378, 381 (2007)) (second alteration in *Green*).

#### 1. Opinion Versus Fact

Because Sandmann invoked diversity jurisdiction, Kentucky substantive law applies. *See Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). In Kentucky, a cognizable claim for defamation requires:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.[5]

*Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014) (internal footnote omitted) (quoting Restatement (Second) of Torts § 558 (Am. L. Inst. 1977) [hereinafter Restatement]). The crux of this appeal is the challenged statements' actionability. "Whether a statement qualifies for protection under the constitutional pure opinion privilege is a legal question to be decided by the court, not a question for the jury." *Cromity v. Meiners*, 494 S.W.3d 499, 504 (Ky. Ct. App. 2015) (citing *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989); *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732 (Ky. 2004)).

The First Amendment protects statements that "cannot reasonably be interpreted as stating actual facts about an individual" in "recognition of the Amendment's vital guarantee of free and uninhibited discussion of public issues." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20, 22 (1990) (quotation marks and alterations omitted). *See Counterman v. Colorado*, 143 S.Ct. 2106, 2115 (2023) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)) ("False and defamatory statements of fact, we have held, have 'no constitutional value.'") In other words, "a viable defamation claim exists only where a reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts." *Compuware Corp. v. Moody's Inv. Services, Inc.*, 499 F.3d 520, 529 (6th Cir. 2007). *See also Milkovich*, 497 U.S. at 21 (statement not opinion where it "is sufficiently factual to be susceptible of being proved true or false" based on "objective evidence").

Kentucky law similarly protects opinion statements from having a defamatory meaning but adopts the Restatement (Second) of Torts' approach to distinguishing between "pure" and "mixed" opinion. *Yancey*, 786 S.W.2d at 857. Pure opinion is absolutely privileged and is based on disclosed facts or on facts known or assumed by both parties to the communication. *Id.* The

---

[5]The parties agree that because Kentucky has rejected the doctrine of "neutral reportage," a newspaper may still be held liable for quoting "newsworthy statements" of third parties. *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 886-87 (Ky. 1981).

Restatement explains that a pure opinion "may be ostensibly in the form of a factual statement if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated."  Restatement § 566 cmt. b.  An opinion may, however, be defamatory and actionable if it is mixed, i.e., "if it implies the allegation of undisclosed defamatory fact as the basis for the opinion." *Yancey*, 786 S.W.2d at 857 (quoting Restatement § 566).  The allegedly defamatory statement is to be "construed as a whole," *id.* (quoting *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981)), and "in the sense in which the readers to whom it is addressed would ordinarily understand it," *id.* at 858 (quoting *Gearhart v. WSAZ, Inc.*, 150 F. Supp. 98, 109 (E.D. Ky. 1957)).

The opinion-versus-fact inquiry thus typically involves two steps under Kentucky law. First, the court determines whether a statement is fact or opinion.  If the statement is factual, the analysis ends there; the statement is considered capable of defamatory meaning.  But if the statement is one of opinion, the court then determines whether that opinion is based on undisclosed defamatory facts.  If so, the statement is capable of defamatory meaning; if not, it is protected opinion.  Here, the district court held that the blocking statements "did not imply the existence of any nondisclosed defamatory facts," and Sandmann does not challenge that aspect of its holding.  So, if the blocking statements are opinion, they are protected by the Constitution and by Kentucky law.

The way a statement is presented or worded affects the ultimate legal determination of whether it is a fact or opinion.  For example, "loose" or "figurative" language can "negate the impression" that the speaker was "seriously maintaining" an assertion of fact.  *Milkovich*, 497 U.S. at 21.  So can "the general tenor" of an article.  *Id.*  Kentucky courts have found statements to be opinion where those statements were couched in qualifying terms, *see Williams v. Blackwell*, 487 S.W.3d 451, 453, 455-56 (Ky. Ct. App. 2016); sufficiently subjective, *see Cromity*, 494 S.W.3d at 503-04; or clearly intended to be opinion when "evident from the totality" of their context, *see Seaman v. Musselman*, No. 2002-CA-001269-MR, 2003 WL 21512489, at *4 (Ky. Ct. App. July 3, 2003).  The inquiry is setting-specific: that a statement may be capable of objective verification in some contexts does not make it an objectively

verifiable fact in *every* context.  Contrary to Sandmann's claim, there is no bright-line rule that statements based on sensory perceptions are necessarily factual.

Start with Phillips's statement to the Washington Post.  First, he explained that his goal was to "find . . . an exit out of this situation."  Having articulated that aim, he then described himself and Sandmann as at an "impasse," a term that can be literal or figurative.  *See* Oxford English Dictionary, *Impasse (Noun)*, https://www.oed.com/view/Entry/92128 (last visited June 22, 2023).  Then, based on Phillips's perception of Sandmann's reaction to his attempt to leave the area, he said that Sandmann "blocked" him and would not "allow" him to retreat.  Whether or not a video shows Phillips attempting to move around or away from Sandmann—or indeed any active movement—does not help us ascertain or objectively verify whether Phillips accurately interpreted Sandmann's actions as purposefully "prevent[ing]" his "passage" away from the crowd to the Lincoln Memorial or refusing to "approve" his exit.  Oxford English Dictionary, *Block (Verb)*, https://www.oed.com/view/Entry/20348 (last visited August 9, 2023); Oxford English Dictionary, *Allow (Verb)*, https://www.oed.com/view/Entry/5460 (last visited August 9, 2023).  And "retreat" need not literally mean to move backwards.  The word also means to "withdraw" or "back down" figuratively.  Oxford English Dictionary, *Retreat (Verb)*, https://www.oed.com/view/Entry/164427 (last visited August 9, 2023).

As the district court noted, Sandmann and Phillips never spoke to each other during the encounter.  It is unclear whether Sandmann knew that students behind him had stepped aside as Phillips approached, which made him the single person standing between Phillips and the Memorial—or whether *Phillips* knew that Sandmann might have been unaware of that fact.  The lack of clarity as to Sandmann's understanding of the situation makes the blocking statements all the more subjective in nature: based on the fact that Sandmann "stood in [Phillips's] way," Phillips felt that he was "blocking" him and not "allowing" his retreat.  There is no way to determine what Sandmann's intent was from the videos of the encounter, which approximate the information available when Phillips made the blocking statements.  *See Cromity*, 494 S.W.3d at 503-04 (defendant's contention that he was not speeding was not provable as false where the evidence available was defendant's "word against" plaintiff's).

*Sandmann v. New York Times Co. et al.*

The blocking statements are comparable to those in *Macineirghe v. County of Suffolk*, No. 13-cv-1512, 2015 WL 4459456 (E.D.N.Y. July 21, 2015).  There, the police were following a man and his son, and the man fell down in front of a police car, which prevented the police from pursuing the car his son was in.  *Id.* at *3-4.  A defendant who was present later provided a witness statement that said, "[t]he older individual then blocked the police vehicle from attempting to chase the [car].  I then saw the older man throw himself to the ground in an attempt to fake being struck by a police car."  *Id.* at *7.  Applying New York law (which, like Kentucky, protects pure opinion but not mixed opinion), the court found as a matter of law that the defendant's assertion—"falling to the ground" was "an attempt to 'block' the car"—was pure opinion based on the defendant's observations of the man's actions.  *Id.* at *14; *see Sandmann v. WP Co.*, 401 F. Supp. 3d 781, 792-93 (E.D. Ky. 2019) (citing *Macineirghe* in initial grant of the Washington Post's motion to dismiss Sandmann's defamation claim).  Like the *Macineirghe* statement, the blocking statements here reflect Phillips's perception of Sandmann's intent as Sandmann stood on the Lincoln Steps.

The statement Phillips made to CBS is of a similar nature.  Even if we assume that Sandmann's physical movements left or right are objectively verifiable, Phillips described those movements as support for his conclusion that Sandmann "decided" he would not move aside and "positioned himself to make sure that he aligned himself with [Phillips] so that he stopped [his] exit."  Here, too, Phillips ascribed subjective intent to Sandmann's conduct.  *See* Restatement § 566 cmt. b ("[Pure opinion] occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct[.]").

Caselaw underscores the importance of considering Phillips's statements in their totality and in the context of the available evidence.  Consider *Milkovich*, where a former Ohio high school wrestling coach alleged defamation by a newspaper and reporter.  497 U.S. at 3-4.  The reporter had authored an article in a local newspaper claiming that the coach had lied under oath at a state board proceeding.  *Id.* at 4-5.  On review, the Supreme Court held, in part:

> [T]he connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false.  A determination whether petitioner lied

> in this instance can be made *on a core of objective evidence* by comparing, *inter alia*, petitioner's testimony before the [] board with his subsequent testimony before the trial court.

*Id.* at 21 (emphasis added).  The defamatory language in question was "an articulation of an objectively verifiable event."  *Id.* at 22 (quoting *Scott v. News-Herald*, 496 N.E.2d 699, 707 (Ohio 1986)).  We have interpreted *Milkovich* to stand for the proposition that "a viable defamation claim exists only where a reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts."  *Compuware*, 499 F.3d at 529 (citing *Milkovich*, 497 U.S. at 21).  Here, videos showed Phillips walking forward into a crowded area, multiple people moving out of his path, and Sandmann standing in front of Phillips.  But whether Sandmann "blocked" Phillips, did not "allow" him to retreat, or "decided" that he would not move aside and "positioned himself" so that he "stopped" Phillips are all dependent on perspective and are not "susceptible" of being proven true or false under the circumstances.[6]  Unlike the testimony in *Milkovich*, there is no "core of objective evidence" that allows us to discern Sandmann's intentions during the encounter.

Also consider *Croce v. Sanders*, 843 F. App'x 710 (6th Cir. 2021).  There, Sanders contacted the New York Times about statistical inaccuracies in scientific articles authored by Croce.  *Id.* at 712-13.  The resulting New York Times article explained that Sanders "has made claims of [Croce's] falsified data and plagiarism directly to scientific journals."  *Id.* at 714.  The article then quoted Sanders, who said, "It's a reckless disregard for the truth."  *Id.*  Also, in the process of his investigation, the journalist who authored the article had written a letter to Croce and his university.  That letter included a sentence with two allegedly defamatory statements: "Dr. Sanders argues—because in his observation [1] the image fabrication, duplication and mishandling, and plagiarism in Dr. Croce's papers is routine . . . —that [2] Dr. Croce is knowingly engaging in scientific misconduct and fraud."  *Id.* at 714-15 (emphasis omitted).

We held that Sanders's quote in the article expressed his opinion because it used the term "reckless," an "imprecise" adjective which "signal[ed] to the listener that the speaker is

---

[6]Phillips was not required to use qualifying terms to signal that he was relaying his perception of the encounter.  A statement that uses such terms "may still imply a false assertion of fact."  *Milkovich*, 497 U.S. at 19.

expressing a subjective point of view." *Id.* at 714.   As for the statements in the letter, we explained that "[t]o say something is routine is to make an imprecise characterization that 'lacks a plausible method of verification.'"   *Id.* at 715 (quoting *Vail v. The Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 186 (Ohio 1995)).   "[T]here is no objective line" that determines "[h]ow many problems make something routine."   *Id.*   "Instead, the line varies from speaker to speaker and from context to context."   And, even though the second statement may have "look[ed] like a statement of fact standing alone, *the full sentence* [made] clear that this statement [was] an expression of Sanders's opinion."   *Id.* (emphasis added).   The statement, which was based on Sanders's observations, was "neither an assertion of fact nor a conclusion that follows incontrovertibly from asserted facts as a matter of logic."   *Id.*   It was "instead a subjective take that is up for debate."   *Id.*   The statement's "broader context" reinforced that conclusion.   *Id.* at 717.

As in *Croce*, Phillips's statements that Sandmann "decided" he would not move aside, "blocked" Phillips, would not "allow" him to retreat, and "positioned himself" so that he "stopped" him are contextual and subjective, not "a conclusion that follows incontrovertibly from asserted facts."   *Id.* at 716.   Phillips's statements expressed his subjective understanding of the situation and of Sandmann's intent, an understanding informed by the pair's proximity, the other students' movement, and the lack of communication during the encounter.

Moreover, the statements appeared in stories that provided multiple versions and descriptions of the events, putting a reasonable reader on notice that Phillips's statements were merely one perspective among many.   The online articles at issue embedded or linked to some version of the video, effectively disclosing the facts upon which Phillips's opinion was based; readers were able to determine for themselves whether they interpreted the encounter as Sandmann deciding to block Phillips, positioning himself to stop him, or not allowing him to retreat.   And Gannett's print articles also presented Phillips's statements in a way that clearly framed his statements as his own perspective of the incident.   The Kenton Recorder, for instance, explained that "[a]ccounts of the episode vary widely and the question of each party's intent has been hotly contested," and that the "[initial] video alone only tells part of the story."   The article then recounted the encounter in detail and provided accounts from both Sandmann and Phillips.

The other two print articles did not even include the allegedly defamatory statements, only Phillips's statement that he had tried to walk away.

Phillips's statements are opinion, not fact. In making this finding, we are not engaging in speculation or reading improper inferences into Phillips's statements, as the dissent suggests. Rather, we are engaging in the task required of us: a legal interpretation of Phillips's statements in their context within the News Organizations' articles. The statements' opinion-versus-fact status is "not a question for the jury." *Cromity*, 494 S.W.3d at 504.

Because the statements are opinion, they are protected by both the Constitution and Kentucky law, and they are nonactionable. The district court did not err in so concluding.

### 2. Appellees' Alternative Grounds

Appellees raise three alternative grounds for affirmance: (1) the statements are substantially true; (2) the statements are not defamatory; and (3) Sandmann's lawsuits are barred by the Kentucky statute of limitations. Because the statements are nonactionable, we need not address these grounds.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.

---

### DISSENT

---

GRIFFIN, Circuit Judge, dissenting.

These cases raise classic claims of defamation. Through their news reporting, defendants portrayed plaintiff Nicholas Sandmann as a racist against Native Americans. Their characterization of Nicholas was vicious, widespread, and false. Defendants' common narrative was readily accepted and effective to the extent that, on national television, NBC's[1] Today Show host Savannah Guthrie asked the 16-year-old if he thought he "owe[d] anybody an apology" for his actions and if he saw his "own fault in any way."[2] Moreover, the false portrayal of Nicholas caused the Diocese of Covington to issue an apology for its parishioner's actions. An apology that was later retracted once the Diocese learned the truth.

The truth is depicted on eighteen stipulated videos of the incident, which unequivocally show that 16-year-old Nicholas Sandmann did nothing more than stand still and smile while confronted by a stranger.[3]

These cases should be submitted to a jury to decide the factual issue of whether each defendant exercised reasonable care in its reporting. I disagree that summary judgment is appropriate. In this regard, the majority opinion affirms the summary judgment granted in favor of all defendants, not on the basis that their reporting was substantially true or that plaintiff was a public figure necessitating a claim of malice, but on the ground that all the news articles were opinion, not fact. I disagree and would reverse and remand for further proceedings.

---

[1]Previously, NBC, CNN, and the Washington Post settled Sandmann's defamation cases against them following the denial on reconsideration of their motions to dismiss. Case No. 2:19-cv-19 (E.D. Ky.), R. 47, 64, 81 (Washington Post); Case No. 2:19-cv-31 (E.D. Ky.), R. 44–45, 69 (CNN); Case No. 2:19-cv-56 (E.D. Ky.), R. 43, 83 (NBC).

[2]Case No. 2:19-cv-56 (E.D. Ky.), R. 23, ID 324; @TODAYshow, TWITTER (Jan. 22, 2019, 5:36 PM), https://twitter.com/TODAYshow/status/1087841570479632384; *Nick Sandmann speaks out on viral encounter with Nathan Phillips*, TODAY (Jan. 23, 2019), https://www.today.com/video/nick-sandmann-speaks-out-on-viral-encounter-with-nathan-phillips-1430461507922.

[3]The eighteen videos are accessible at https://www.opn.ca6.uscourts.gov/media/mediaopn.php.

In my view, the statements that Sandmann blocked Nathan Phillips's ascension to the Lincoln Memorial; prevented Phillips from retreating; and impeded Phillips's movements by stepping to his left and stepping to his right, were actions capable of objective verification. Thus, because these events can be objectively verified, I would hold that the opinion exception to the laws of defamation does not apply.

I.

Defendants are media entities that covered the incident at the Lincoln Memorial; none of the reporters who wrote the news articles at issue witnessed the event. Many of the defamatory statements are reprintings of the following statement Phillips gave to the Washington Post:

> It was getting ugly, and I was thinking; I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial. I started going that way, and that guy in the hat stood in my way, and we were at an impasse. He just blocked my way and wouldn't allow me to retreat.

Case No. 2:20-cv-23 (E.D. Ky.), R. 53-2, ID 729 (Affidavit of Nathan Phillips); Cleve R. Wootson Jr., Antonio Olivo, and Joe Heim, *'It was getting ugly': Native American drummer speaks on his encounter with MAGA-hat-wearing teens*, THE WASHINGTON POST (January 22, 2019) https://www.washingtonpost.com/nation/2019/01/20/it-was-getting-ugly-native-american-drummer-speaks-maga-hat-wearing-teens-who-surrounded-him/. The articles share a common narrative. Each title sets the tone and vilifies Sandmann; meanwhile, the contents cast him in a negative light while often praising Phillips and embracing his version of events as authoritative and factually accurate.

A.

Sandmann alleges that two versions of a January 19, 2019, article by the New York Times Company were defamatory. The original headline was "Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March," and the revised headline was "Viral Video Shows Boys in 'Make America Great Again' Hats Surrounding Native Elder." The only other difference between them was a disclaimer at the beginning of the revised version: "Interviews and additional video footage have offered a fuller picture of what happened in this

encounter, including the context that the Native American man approached the students amid broader tensions outside the Lincoln Memorial. Read the latest article here."

The article began with a video of Phillips facing Sandmann; its caption reported Phillips's false claim that the students chanted "build that wall" when he was in their midst and editorialized that "[t]he episode . . . was widely condemned."[4]  Without explaining that Phillips approached the students, the article described an "unsettling encounter" with "a throng of cheering and jeering high school boys, predominantly white and wearing [red] 'Make America Great Again' gear, surrounding a Native American elder."  After noting that the students could face school discipline up to expulsion, the article politicized the standoff:  "In video footage that was shared widely on social media, one boy, wearing the red hat that has become a signature of President Trump, stood directly in front of the elder, who stared impassively ahead while playing a ceremonial drum."[5]

Next, the article quoted a statement by the Diocese of Covington and Covington Catholic High School (where Sandmann was a student), apologizing for the incident.  It then characterized the event as "the latest touchpoint for racial tensions in America," and stated that "[t]he episode drew widespread condemnation from Native Americans, Catholics and politicians alike."  The article then identified Phillips, quoted his Washington Post statement, and reiterated his claim that the students chanted "build that wall."  After briefly discussing the Indigenous Peoples March (an event to celebrate Native Americans and raise awareness as to that community's issues, which Phillips attended), the article closed by quoting the Kentucky Secretary of State, who called the incident a "horrific scene[]."

---

[4]Phillips gave an interview near the Lincoln Memorial Reflecting Pool after Sandmann walked away. During the interview, Phillips claimed the Covington Catholic High School students chanted "build that wall." However, the audio of the video evidence demonstrates that the students did not make such a chant.  "Build the wall" is a reference to President Trump's vow to secure the southern border by building a wall between the United States and Mexico.  Defendant New York Times has characterized "build the wall" as a "racist chant."  Case No. 2:20-cv-23 (E.D. Ky.), R. 1, ID 35; Jamelle Bouie, *Trump's Wall of Shame*, THE NEW YORK TIMES (Jan. 24, 2019), https://www.nytimes.com/2019/01/24/opinion/trump-wall-shutdown.html.  The "build that wall" chant is not at issue on appeal.

[5]Sandmann bought his "Make America Great Again" hat that day as a souvenir after he and his classmates visited the White House.

### B.

Sandmann alleges that four articles by ABC News, Inc. were defamatory.

### 1.

ABC published its first article on January 20, 2019, with the headline "Viral video of Catholic school teens in 'MAGA' caps taunting Native Americans draws widespread condemnation; prompts a school investigation." The article opened with the assertion that "[o]utrage spread across the political spectrum" about the confrontation and stated that the students "appeared to mock and chant over the voices of a small group of Native Americans." "The most jarring of several viral videos," it proclaimed, showed Sandmann "stand[ing] motionless and smirking for more [than] three minutes" at Phillips. It continued: "Phillips remain[ed] outwardly placid and composed throughout the viscerally distressing confrontation."

Focusing on Phillips, the article quoted his statement that students chanted "build that wall," followed by a picture of Sandmann captioned: "[a] diocese in Kentucky apologized" for "a student in a 'Make America Great Again' hat mocking Native Americans outside the Lincoln Memorial." The article then reprinted the Washington Post statement before quoting an unnamed student who stated that Phillips approached the students and Sandmann "didn't say anything or move—he just stood there." It also stated that one witness claimed, "no one from the Native American group instigated the episode." Only then did the article mention that Sandmann had released a written statement, noting that he "defended" his actions and he did not hear "any students chant 'build that wall' or anything hateful or racist at any time." The article omitted the portion of Sandmann's statement asserting that he did not block Phillips.

After describing reactions and "[f]ury" over the confrontation, the article included a picture with an editorial caption: "students mock[ed] Native Americans outside the Lincoln Memorial." Next, a "conservative commentator['s]" reaction was highlighted, calling the students "#MAGA brats" whose behavior was in contrast with "the calm dignity and quiet strength of Mr. Phillips." The ABC article then compared the confrontation at the Lincoln Memorial to an incident earlier in the week in which President Trump tweeted about "the Wounded Knee Massacre and the Battle of Little Bighorn" and the negative reactions that

followed President's Trump's tweet.  Finally, the article concluded with a quote from a journalist "covering Native American issues," who noted that Phillips had "been the subject of racism and ridicule many times in his life" and "to see him stand there and maintain his composure and resolve was just an incredible testament to his heart and his ability to be a warrior."

2.

The same day, ABC published a second article with the headline "Teen accused of taunting Native American protesters in viral video says he's receiving death threats."  The subheading stated "Sandmann was accused of mocking a Native American protester on Friday."  A video at the top of the article was captioned:  "The teens seen appearing to mock a group of Native Americans that drew widespread condemnation revealed what allegedly happened before and after the incident."

The article's body first quoted part of Sandmann's statement, in which he said he had "been falsely accused," he "never interacted" with Phillips, and he "was startled and confused as to why [Phillips] approached [him]."  It then switched to Phillips's version of events, noting that he "said the teens yelled derogatory comments at him before the stare down took place."  The article repeated Phillips's false claim that students chanted "build that wall" and reprinted the Washington Post statement.  The article then noted that Sandmann refuted these claims, quoting portions of his statement that no students chanted "build that wall" and no one tried to block Phillips.  After noting that Sandmann and his parents had received death threats because of the confrontation, the article included an excerpt from the statement by the Diocese of Covington and Covington Catholic condemning the students.  The article concluded by returning to Sandmann's statement, noting that he "defended his actions" and "planned to cooperate with the school's ongoing investigation."

3.

The next day, ABC published a third article, this time with the headline "Videos show fuller picture of DC clash between high school students, Native Americans."  The article noted that additional video showed the leadup to the confrontation with a group of Black Hebrew Israelites (a religious group that advocates for racial separatism and views African Americans as

descendants from the Hebrews in the Bible; it was proselytizing loudly in the area with aggressive and derogatory language). And it linked to Sandmann's statement before quoting Phillips as saying, "I realized I had put myself in a really dangerous situation." Directly below that quote, the article embedded a video with a caption noting that Phillips was "mocked and taunted by a group of young men." The article continued, stating that Sandmann "claim[ed] he was the one trying to deescalate the situation." It also noted that Sandmann thought the adults— not the students—were to blame; yet the article asserted the video of the incident "gave many who watched it a different impression." The article then repeated Phillips's claim that students chanted "build that wall" and that Sandmann "wouldn't let [Phillips] move." After this, the article switched back to Sandmann's version of events, quoting him as saying that he "did not see anyone try to block [Phillips's] path." The article concluded by noting that the Diocese of Covington "apologized for the incident" and "promised to take 'appropriate action, up to and including expulsion.'"

4.

The fourth ABC article was also published on January 20, 2019, with the headline "Students in 'MAGA' hats taunt indigenous elder, demonstrators in Washington: VIDEO." A video captioned "Jarring videos show a crowd of teenage boys sporting 'Make America Great Again' hats as they seemingly intimidate and mock a group of Native Americans at the Indigenous Peoples March in Washington, D.C." appears before the article's text. The article itself opens by stating that Phillips "was seen in online video being taunted outside the Lincoln Memorial." After explaining that Phillips was trying to deescalate the conflict between the Black Hebrew Israelites and the Covington Catholic students, the article noted that video showed the students and Black Hebrew Israelites "taunt[ing]" each other. It then turned to Sandmann, noting that video showed him "stand[ing] directly in front of and star[ing] at Phillips." The article reprinted part of Sandmann's statement saying he was trying "to diffuse [sic] the situation" by "remaining motionless and calm," and that he "never felt like [he] was blocking" Phillips. But the article also quoted another Native American protester who claimed he and Phillips were attempting "to defuse the situation" by approaching the students. After quoting Phillips's claims that the students chanted "build that wall" and that he was blocked, it returned

to the other protester, who stated that he "feared the crowd could turn ugly," although the students eventually changed from "mocking [the Native Americans] and laughing" at them to "singing with [them]." Right after this, the article quoted the unnamed student who claimed that Sandmann "didn't say anything or move—he just stood there. As time went on the man with the drum got closer to his face." The article concluded with the statement from the Diocese of Covington apologizing to Phillips, criticizing the students, and stating that students could be expelled.

### C.

Sandmann alleges that a news clip and an article by CBS News, Inc. were defamatory.

### 1.

The January 20, 2019, CBS news clip opens with the anchor stating:

> If you've been anywhere near your social media this weekend, checking in on your phone, you may have seen a video that shows a group of high school students in what appears to be a standoff with a Native American man on the National Mall in Washington, D.C. The problem is the story as originally reported is incomplete. We have more information that provides better context and depth to what actually happened.
>
> *    *    *
>
> The problem is this video inflamed people who said, "How disrespectful of this young man and the students." There was a report that the students were chanting "build the wall."
>
> The problem is there was another video nearly two hours in length, most of which we have seen. And the context it provides suggests that the story is not as originally reported.
>
> We never heard the students saying, "Build that wall." What we heard was a chant among the students that appeared to be a sports chant, right? High school students chanting as they were standing in front of this man who was beating his drum.

*Native American man seen in viral video of confrontation speaks out*, CBS News (Jan. 20, 2019), https://www.cbsnews.com/video/native-american-man-seen-in-viral-video-of-confrontation-speaks-out/.

He then interviewed Phillips, who stated:

> [Sandmann] just stood in front of me, and when the others were moving aside and letting me go, he decided that he wasn't going to do that. You know, I tried to, when I was coming up the steps, I seen [sic] him start putting himself in front of me, so I slided [sic] to the right, and he slided [sic] to the right. I slided [sic] to the left and he slided [sic] to the left—so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit.

*Id.* (This will be called the "sliding statement" for ease of reference.) Phillips claimed that the interaction lasted about three minutes and it ended when Sandmann walked away. As the interview concluded, the anchor stated that Sandmann would likely "be disciplined" after returning to school; Phillips said he thought the chaperones were responsible for the incident and that he wanted Sandmann to "forgive himself," which the anchor repeated and said was "a very powerful statement." *Id.* After the interview with Phillips ended, the anchor reiterated that the original story was incomplete, the students might be "disciplined, possibly even expelled," and that Phillips inserted himself in the group of students to try to defuse tensions with the Black Hebrew Israelites. *Id.*

2.

CBS also published an article the same day with the headline "Native American veteran in viral video of confrontation speaks out." The article opened with Phillips's statement that he "inserted himself between the students and a small group of African American protesters, known as the [B]lack Hebrew Israelites, to diffuse [sic] the situation." It then included a portion of Sandmann's statement asserting that the students performed school chants in response to the Black Hebrew Israelites and noted that, according to Sandmann, he "didn't speak to Phillips, nor did anyone block [Phillips's] path." Next, the article quoted Phillips's sliding statement and noted that Phillips thought the chaperones were responsible for the event. It then noted that "[t]he Diocese of Covington and Covington Catholic High School said the incident is being investigated and they would 'take appropriate action, up to and including expulsion.'" The article concluded with Phillips's statement that he hoped Sandmann could forgive himself.

D.

Sandmann alleges that nine articles published by affiliates of Gannett Co., Inc., were defamatory: two print and three online articles by The Cincinnati Enquirer, one print and one online article by The Detroit Free Press, and a single online article each by The Louisville Courier-Journal and The Tennessean.

1.

The first online article by The Cincinnati Enquirer was published on January 19, 2019, and updated on January 20, 2019, with the headline "NKY Catholic school faces backlash after video of incident at Indigenous Peoples March surfaces." The article began by stating that the students "surrounded, intimidated and chanted over Native Americans" during the confrontation. It then noted that Sandmann "stood nearby [Phillips] and stared at him" during the incident, before including part of Sandmann's statement asserting that he "never interacted with" Phillips and that "by remaining motionless and calm, [Sandmann believed he] was helping to diffuse [sic] the situation."

After this opening, the article stated, "Phillips initially approached the students in an attempt to defuse the situation." "But he was quickly swarmed." The article then quoted the Washington Post statement, which was immediately followed by part of Sandmann's statement saying he did not block Phillips. Following these statements, the article quoted Phillips's false claim that students chanted "build that wall."

It then included part of the Diocese of Covington's statement apologizing to Phillips and saying that it would investigate and potentially expel the students. Next, the article mentioned President Trump's then-recent tweet about the Wounded Knee Massacre and the Battle of Little Bighorn and concluded with a lengthy discussion of reactions to the incident on social media, which all unflinchingly criticized Sandmann and the other students. This included a reaction from a Mohawk tribe member noting that Phillips "has been the target of racial animosity in the past."

2.

The second online article by The Cincinnati Enquirer was published on January 20, 2019, and was essentially identical to the first print article by The Cincinnati Enquirer, published four days later on January 24, 2019.  The print article's headline was "Video being analyzed from incident in Washington, DC," and the online headline was "Analysis: What the video from the incident at the Indigenous Peoples March tell us about what happened."

The online version[6] began by stating that videos of the standoff had "sparked intense debate" and noting that "The Enquirer has reviewed video, shot from different angles, and paired it with interviews and other information to help bring clarity to what transpired."  The article characterized Phillips as "the indigenous man surrounded by students in the video that sparked the outcry" and linked to Sandmann's statement.  It then addressed videos of the event, explaining that "[t]he initial video" showed Sandmann "in a 'Make America Great Again' hat, standing very close to and staring at Phillips while Phillips played the drum and chanted," while "[t]hey were surrounded by a larger group of students whose chants drowned out" Phillips.  But then the article noted that the "[initial] video alone only tells part of the story" because additional video showed the prior interaction between the students and the Black Hebrew Israelites.

Phillips was then quoted, explaining that he approached the students because they were "attacking" the Black Hebrew Israelites.  The article immediately refuted that claim:  "[n]one of the videos show students attacking the Black Hebrew Israelites."  Turning to the confrontation itself, the article stated that "the crowd of students" "circled [Phillips] and began clapping and cheering" as Sandmann "stood in front of Phillips with a smirk on his face, . . . [with the two] nearly touching as Phillips sang and beat his drum."  Part of the Washington Post statement was then included, which was immediately followed by Sandmann's statement that he did not block or interact with Phillips.  The article then stated that the crowd began to separate after Sandmann walked away.  It concluded by noting some final interactions between the students and the Black Hebrew Israelites.

---

[6]In this and similar situations, I will focus on the online articles to avoid unnecessary repetition.

3.

The third online article by The Cincinnati Enquirer was published on January 24, 2019, and its corresponding second print article was published the next day. The print headline was "I still have forgiveness in my heart," and the online headline was "Nathan Phillips on 'Today' show: 'I still have forgiveness in my heart.'"

These articles related to an interview Phillips gave on the Today Show the day after Sandmann's corresponding Today Show interview. The online article began by stating that Phillips approached the students to defuse the situation with the Black Hebrew Israelites before noting that, despite his anger at the event, he would forgive the students. After this introduction, the article stated that Phillips believed Sandmann should apologize; continued to claim that the students chanted "build that wall"; and explained that he was "trying" to walk away from the confrontation but that Sandmann "stood in his way." The article continued by stating that Phillips "felt that [Sandmann's] statement was coached and lacked sincerity and responsibility," and quoted Phillips as saying that he "believe[d] there [were] intentional falsehoods in his testimony," although it is unclear whether this refers to Sandmann's statement or his appearance on the Today Show. The article next cited Sandmann's Today Show statement that he was "not sorry for standing in front of Phillips, with what some have characterized as a smirk on his face." It concluded by quoting Phillips saying that Sandmann "needs to put out a different statement" because he "didn't accept any responsibility."

4.

The Detroit Free Press published an online article on January 24, 2019, and an essentially identical print version the next day. The online article's headline was "Nathan Phillips on 'Today' show: Student's explanation felt insincere"; the print headline was "Phillips on 'Today' show: Student seemed insincere."

These articles were about Phillips's interview with the Today Show. Before addressing the encounter, the online article noted that Sandmann's interview "upset" Phillips. It explained that Phillips approached the students following their interaction with the Black Hebrew Israelites and that he "described [that] encounter as threatening." The article stated that, "[w]hile

Sandmann said he wished . . . the students had walked away, Phillips explained he tried to walk away and was blocked." After explaining Phillips's version of how he was blocked in more detail, the article concluded by stating that, "although [Phillips] is upset about the issue, he has forgiveness for the students and even the chaperones who were there."

5.

The Louisville Courier-Journal article was published on January 19, 2019, and was primarily about a reaction from Stormy Daniels to the incident.[7] Headlined "Stormy Daniels calls out 'disgusting punks' from Covington Catholic," the article reported:

> Daniels weighed in Saturday on the incident involving Covington Catholic High students after video surfaced showing a young man in a "Make America Great Again" cap trying to intimidate a Native American elder. Dozens of Covington students can be seen jeering and chanting along.
>
> "I'm suddenly in favor of building a wall . . . around Covington Catholic High in KY," wrote Daniels, legally known as Stephanie Clifford, on Twitter. "And let's electrify it to keep those disgusting punks from getting loose and creating more vileness in society."

The article then noted that the Diocese of Covington "condemned the actions of the students against" Phillips "after millions of people viewed videos of incident [sic], many expressing their outrage on social media." It concluded with the Washington Post statement.

6.

The Tennessean article was published on January 30, 2019, with the headline "Covington school kids intimidated Native Americans. Who taught them that? | Opinion," and the subheading "The confrontation between Covington Catholic High School students and a Native American elder exposed ignorance and blatant racism."

The article criticized the students, calling them a "mob" of "young villains" who engaged in "loathsome conduct" when they "shout[ed] and chant[ed] at Phillips" and performed "racist, mock Indian dances." It also specifically targeted Sandmann, editorializing that he had "a

---

[7]Stormy Daniels is a former adult film actress who alleges that she had an affair with Donald Trump sixteen years ago.

disgusting smirk" during the confrontation. Sandmann, according to an eyewitness, "refused to let [the Native American protesters] pass" while they were, in the article's eyes, "surrounded by a sea of white youth." The article stated people must "disbelieve their own eyes" and be "blinded by racism" to "defen[d] the indefensible"—meaning Sandmann's actions. It concluded by stating that, "If anything, perhaps this episode will help to expose and root out that bevy of racism that is Covington Catholic. This school is emblematic of the social malignancy that is a festering sore on the body politic of America."

### E.

The Rolling Stone, LLC, article was published on January 22, 2019, with the headline "Trump Comes to the Rescue of the MAGA Teens" and the subheading "Right-wing media is using confusion over what exactly happened to paint the Covington Catholic teenagers as victims."

The article described the confrontation as Sandmann "standing face-to-face with Phillips" amid "a rowdy group of students" who were "taunt[ing]" Phillips. It then noted that, after Sandmann released his statement, "[t]he media ate it up, walking back previous headlines in deference to the narrative put forth by Sandmann." Next, the article focused on President Trump's response to the event and its media coverage before paraphrasing Sandmann's statement and his claim that Phillips approached him; the article did not mention Sandmann's assertion that he did not see anyone block Phillips. The article then stated that Phillips "disputed Sandmann's account, as have other videos of the incident showing Covington students circled around Phillips, who said he felt threatened." Phillips's Washington Post statement was then quoted, before the article stated that the videos "show a bunch of teens in #MAGA gear aggressively mocking a Native American" and criticized the "[r]ight-wing media" for siding with the students in the incident, which it hypothesized was because the students were "predominantly white." The article then included three tweets critical of sympathy toward Sandmann and the other students before concluding by saying the students would hopefully "live to regret their behavior," but that this was unlikely in "Trump's America."

## II.

Sandmann filed separate—but substantially similar—complaints against defendants the New York Times, ABC, CBS, Gannett, Rolling Stone, and their affiliates. He alleged that defendants defamed him by falsely reporting that he blocked Phillips's ascension to the Lincoln Memorial and prevented Phillips from retreating from the encounter. In addition, Sandmann's complaint against CBS included a claim that CBS falsely reported that Sandmann impeded Phillips's movements by stepping to his left and stepping to his right. The district court granted summary judgment in defendants' favor, ruling that all the news articles were opinion, not statements of fact, and therefore exempt from the laws of defamation. Sandmann has appealed.[8]

## III.

Sandmann argues that the blocking, retreating, and sliding statements were objectively verifiable and, therefore, factual statements capable of defamatory meaning. I agree.

We review de novo the district court's grant of summary judgment. *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the record in the light most favorable to the nonmovant. *Wilmington Tr. Co.*, 859 F.3d at 370. Furthermore, where there is "undisputed video evidence," such evidence can be used to disregard other statements that are "blatantly and demonstrably false." *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021).

---

[8]Three additional issues raised in this appeal are without merit. First, I agree with the majority opinion that the law-of-the-case doctrine does not apply. Second, although not addressed by the majority, the statute of limitations does not bar Sandmann's claims because it was tolled while Sandmann was a minor. *See* Ky. Rev. Stat. Ann. § 413.140(1)(d); Ky. Rev. Stat. Ann. § 413.170(1); *Fann v. McGuffey*, 534 S.W.2d 770, 778 (Ky. 1975); *Hammers v. Plunk*, 374 S.W.3d 324, 331 (Ky. Ct. App. 2011) (en banc). Finally, the eighteen videos of the incident demonstrate defendants' reporting was not true, and the truth of the incident is too integral to the videos for the substantially true doctrine to apply. *See Ky. Kingdom Amusement Co. v. Belo Ky., Inc.*, 179 S.W.3d 785, 791–92 (Ky. 2005); *Bell v. Courier-J. & Louisville Times Co.*, 402 S.W.2d 84, 87 (Ky. 1966).

"[S]tatements that cannot reasonably be interpreted as stating actual facts about an individual" are statements of opinion, not fact, and are exempt from the laws of defamation. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (internal quotation marks and brackets omitted). The use "of loose, figurative, or hyperbolic language . . . [can] negate the impression that the writer was seriously maintaining" a factual assertion, as can an article's "general tenor." *Id.* at 21. "Put differently, a viable defamation claim exists only where a reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts." *Compuware Corp. v. Moody's Inv. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007); *see also Milkovich*, 497 U.S. at 21 (statement that the plaintiff committed perjury was not opinion because it was "sufficiently factual to be susceptible of being proved true or false" based on "objective evidence").

Under Kentucky law, "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion." *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989) (quoting Restatement (Second) of Torts § 566 (1977)). While "[p]ure opinion" is "absolutely privileged," a mixed fact-and-opinion statement is not, as long as the statement "may reasonably be understood to imply the assertion of undisclosed facts which may justify the expressed opinion about the undisclosed facts." *Id*. (citation omitted). By contrast, factual statements are always capable of defamatory meaning. *See id*. at 857–58. We must consider the statements in "context" and construe them "as a whole" when considering whether they are facts or opinions. *Id*. at 857 (citation omitted).

Caselaw establishes a few helpful guideposts for this fact-intensive analysis. For example, a statement couched in qualifying terms suggests that it is an opinion. *See Williams v. Blackwell*, 487 S.W.3d 451, 453, 455–56 (Ky. Ct. App. 2016) (holding that the statements "it appears that the current reimbursement policy is excessive and a poor use of public funds" and "the possible profit that the Sheriff received from managing his office vehicle fleet could be interpreted to be in excess of his statutory maximum salary limit" are opinions). Meanwhile, some statements are so subjective that they need not be couched in such terms to be opinion statements. *See Cromity v. Meiners*, 494 S.W.3d 499, 503–04 (Ky. Ct. App. 2015) (concluding

that statements alleging that "[the plaintiff] is a liar" was an opinion); *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 737–38 (Ky. Ct. App. 2004) (saying that the plaintiff's conduct "was throwing up red flags," an employee for the defendant "felt like he had been conned by the world's greatest con man," and the company "would be straightened out as soon as we get rid of" the plaintiff were all opinions (internal quotation marks omitted)).

That a third party (Phillips) made the statements also does not shield defendants from liability for its reporting. The Kentucky Supreme Court has rejected the neutral reportage doctrine—which would grant defamation immunity to publishers for reprinting "newsworthy statements." *McCall v. Courier-J. & Louisville Times Co.*, 623 S.W.2d 882, 886–87 (Ky. 1981) (per curiam) (quotation marks omitted). Even though Phillips—a non-party in this litigation—made the "blocking," "retreating," and "sliding" statements, defendants may be liable for republishing those false statements.

These cases are commonsense applications of a simple question: are the statements objectively verifiable? Reading fairly the blocking, retreating, and sliding statements leads to an unequivocal "yes." Begin and end by reviewing the videos. The videos show that, while Nicholas Sandmann was standing still, Phillips walked up to him, played his drum, and sang inches from Sandmann's face. The 16-year-old's only reaction to this unexpected approach by an adult whom he did not know was to smile. During the roughly six-minute encounter initiated by Phillips, a gap in the crowd developed through which Phillips could have walked past or away from Sandmann had he chosen to do so. Phillips did not do so; instead, he remained where he chose to confront the 16-year-old boy only inches from his face.

Next, consider what the statements are about: the physical positioning of Phillips and Sandmann. Then ask whether physical positioning is objectively verifiable. It certainly is. And here, the video evidence conclusively demonstrates that Phillips's narrative is indeed "blatantly and demonstrably false." *Boykin*, 3 F.4th at 842.

The majority opinion holds that the blocking, retreating, and sliding statements were likely Phillips's subjective impressions of Sandmann's intent. Such speculation is contrary to the text of the news stories, which do not state that they are reports of Phillips's *perception* of Sandmann's *intent*.

These are three statements that the majority holds are opinion:

1. "I started going that way, and that guy in the hat [Sandmann] stood in my way and we were at an impasse . . . ."

2. "He [Sandmann] just blocked my way and wouldn't allow me to retreat."

3. "I seen [sic] him start putting himself in front of me, so I slided [sic] to the right, and he slided [sic] to the right. I slided [sic] to the left and he slided [sic] to the left—so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit."

Rather than construing the text of these statements with their plain meaning, the majority rewrites these news articles as if defendants had reported that Phillips *perceived* that Sandmann *intended* to block his way, *intended* to prevent his retreat, and *intended* to slide to his left and right. The majority's creative journalism is apparently based on its inference that defendants meant to report that Phillips was recounting his perceptions of Sandmann's intentions.

In the words of the majority opinion, "Phillips felt that he [Sandmann] was 'blocking' him and not 'allowing' his retreat. There is no way to determine what Sandmann's intent was from the videos of the encounter, which approximate the information available when Phillips made the blocking statements." However, contrary to the majority's rewrite, the articles do not report Phillips's feelings or perceptions. Rather, the articles report a factual encounter as recited by Phillips.

Similarly, the majority rewrites the reporting of Sandmann's actions of sliding to the right and sliding to the left as Phillips's perception of Sandmann's intent. ("Here, too, Phillips ascribed subjective intent to Sandmann's conduct."). Again, the news stories do not cabin their factual recitations as being Phillips's perceptions or feelings.

In my view, the inferences created by the majority are not reasonable and are inconsistent with the plain wording of the text of defendants' news reports. Moreover, such inferences are contrary to our summary judgment rule that provides that all reasonable inferences must be construed in favor of the nonmoving party—Sandmann—not in favor of the moving party—defendants. *Wilmington Tr. Co.*, 859 F.3d at 370. The majority's divergent approach—reading inferences into Phillips's statements—wrongly views the record evidence on summary judgment in defendants' favor.

When describing Sandmann's physical actions, Phillips never used qualifying terms like "I think" or "it seemed" or "I felt" that would have suggested he was relaying his perceptions, feelings, or opinions. *Cf. Blackwell*, 487 S.W.3d at 453, 455–56. Instead, he recited, and defendants reported, a straightforward factual account of events: Phillips approached Sandmann; thereafter Sandmann moved to his left and his right, blocked him, and prevented his retreat. Whether Sandmann did so is objectively verifiable.

The majority's further reliance on distinguishable and nonbinding caselaw is not persuasive. For example, in *Macineirghe v. County of Suffolk*, a district court ruled that a defendant's statement that a man "blocked" a police car to prevent it from pursuing a fleeing suspect was an opinion. No. 13-cv-1512, 2015 WL 4459456, at *13–14 (E.D.N.Y. July 21, 2015). But that court never addressed whether that statement was objectively verifiable and, therefore, did not engage with the analysis at issue here. *Id*. at *10, 13–15. Similarly unhelpful is our unpublished opinion in *Croce v. Sanders*, 843 F. App'x 710 (6th Cir. 2021). At issue there were statements about whether the plaintiff had engaged in dishonest research. *Id*. at 712–13. But honesty is determined by an inherently subjective value judgment, not an objective factual inquiry like physical positioning. The statements in *Croce* are fundamentally different from those here. Neither case engaged in a materially similar fact-versus-opinion analysis as we have here, so neither is persuasive nor applicable.

In sum, facts matter. The video evidence shows that Phillips initiated an encounter with a 16-year-old boy. In response to this action from a stranger, Nicholas Sandmann did nothing more than stand still and smile. At bottom, the blocking, retreating, and sliding statements

reported by defendants were "sufficiently factual to be susceptible of being proved true or false" based on "objective evidence," *Milkovich*, 497 U.S. at 21, and thus statements of fact.  Moreover, the statements were *not* qualified to the effect that they were Phillips's perceptions of Sandmann's intent.  On the contrary, the text of the statements reported by defendants were that Sandmann had so acted.

## IV.

For these reasons, I respectfully dissent.  I would reverse the grant of summary judgment and remand for further proceedings.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 22-5734/5735/5736/5737/5738

NICHOLAS SANDMANN,

    Plaintiff - Appellant,

    v.

NEW YORK TIMES COMPANY (22-5734); CBS NEWS, INCORPORATED, VIACOMCBS, INCORPORATED, and CBS INTERACTIVE, INCORPORATED (22-5735); ABC NEWS, INC., ABC NEWS INTERACTIVE, INCORPORATED, and WALT DISNEY COMPANY (22-5736); ROLLING STONE, LLC and PENSKE MEDIA CORPORATION (22-5737); GANNETT COMPANY, INC. and GANNETT SATELLITE INFORMATION NETWORK, LLC (22-5738),

    Defendants - Appellees.

> **FILED**
> Aug 16, 2023
> DEBORAH S. HUNT, Clerk

Before:  GRIFFIN, STRANCH, and DAVIS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk